UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAYNE L. ELMER,

        Plaintiff,

    v.                                    Case No. 19-cv-97-pp

KILOLO KIJAKAZI,

        Defendant.

---

**ORDER AFFIRMING FINAL ADMINISTRATIVE DECISION OF
COMMISSIONER**

---

On January 16, 2019, the plaintiff filed an appeal seeking review of an administrative law judge's final administrative decision that found her not "disabled" within the meaning of the Social Security Act. Dkt. No. 1. The Appeals Council did not assume jurisdiction of the case, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. §404.984. The court will affirm the Commissioner's decision.

## I.    Procedural History and the ALJ's Decision

On September 28, 2012, the plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging a disability onset date of September 17, 2012. Dkt. No. 16-3 at 22. The Social Security Administration (SSA) initially denied the plaintiff's claim on May 10, 2013, dkt. no. 16-5 at 2, and upon reconsideration on September 18, 2013, id. at 27. On July 8, 2015, the plaintiff appeared at a hearing represented by Attorney

1

Robert C. Angermeier. Dkt. No. 16-3 at 22. ALJ Jeffry Gauthier issued a partially favorable decision on September 24, 2015, finding that the plaintiff was disabled beginning on September 4, 2015, but was not disabled prior to that date. Id. at 35. On November 7, 2016, the Appeals Council denied review. Id. at 2.

On January 11, 2017, the plaintiff filed an appeal in the Eastern District of Wisconsin seeking judicial review of the unfavorable portion of the ALJ's decision denying the plaintiff benefits from September 17, 2012 to September 3, 2015. Dkt. No. 16-22 at 1–6. On June 29, 2017, the plaintiff and Acting Commissioner Nancy A. Berryhill stipulated to reversal and remand to the ALJ for further proceedings under sentence four of 42 U.S.C. §405(g). Id. at 22–23. The next day, District Judge J.P. Stadtmueller adopted the parties' stipulation and reversed and remanded the case. Id. at 21. On October 16, 2017, the Appeals Council remanded to the ALJ with instructions regarding reconsideration of the period between September 17, 2012 and September 3, 2015 and the issues to be resolved. Id. at 28–32.

On June 22, 2018, the plaintiff appeared at a hearing represented by Attorney Meredith Marcus and Frederick Daley. Dkt. No. 16-21 at 34. Both the plaintiff and the vocational expert (VE) Elizabeth Pasikowski testified. Id. at 54–90. On September 13, 2018, ALJ Gauthier issued a decision finding that the plaintiff was not "disabled" as defined by the Social Security Act from September 17, 2012 through September 3, 2015. Id. at 23–24. The ALJ found that the plaintiff, born September 5, 1960, was fifty-two to fifty-four years old

2

during the relevant period and "ha[d] at least a high school education and is able to communicate in English." Id. at 13, 22. The ALJ acknowledged the plaintiff's testimony that she had worked as a police clerk for a municipality from 1986 to 2012 and at a car dealership as a service concierge from September 2013 through June 2015, and found that the plaintiff was unable to perform her past work as a municipal clerk/police clerk. Id. at 13, 22. The ALJ also found that the plaintiff's earnings record showed that the plaintiff remained "insured through September 30, 2021." Id. at 7.

In evaluating a claim for disability benefits, the ALJ must follow a five-step, sequential process. Apke v. Saul, 817 F. App'x 252, 255 (7th Cir. 2020); Fetting v. Kijakazi, 62 F.4th 332, 336 (7th Cir. 2023). The following chart summarizes the ALJ's findings at each step regarding the plaintiff's Title II claim:

| STEP | FINDINGS |
|------|----------|
| Step One: Is the claimant engaged in substantial gainful activity? | The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 17, 2012 through September 3, 2015, the day before her established onset date. |
| Step Two: Is the impairment or combination of impairments severe— does it significantly limit the claimant's mental or physical ability to do basic work activities? | The claimant had the following severe impairments: multiple sclerosis, anxiety disorders and affective disorders. |

3

| | |
|---|---|
| <u>Step Three</u>: Does the impairment meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity? | The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. |
| <u>Step Four</u>: Does the claimant's residual functional capacity allow the claimant to perform past relevant work? | The claimant was unable to perform any past relevant work.<br><br>The claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she had additional limitations. She could not operate foot controls with the left lower extremity. She could occasionally climb ramps or stairs. She could never climb ladders, ropes or scaffolds. She could never work at unprotected heights nor around moving mechanical parts. She could occasionally operate a motor vehicle in the workplace. She could never work in an environment that would result in exposure to extreme heat. She could never work in an environment that would result in exposure to vibration beyond what one experiences in everyday life. With regard to understanding, remembering, and carrying out instructions, the claimant could perform simple, routine, and repetitive tasks, but not at a production rate pace (for example, not assembly line work). With regard to the use of judgment in the workplace, she could make simple work-related decisions. She would have been capable of frequent appropriate interactions with supervisors and occasional |

4

| | appropriate interactions with co-workers and the general public. The claimant would have been capable of tolerating occasional changes in a routine work setting. |
|---|---|
| <u>Step Five</u>: Can the claimant perform any other work existing in significant numbers in the national economy? | The claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy: packer, sorter and assembler. |

<u>See</u> Dkt. No. 16-21 at 9, 10, 12, 23.[1]

The ALJ concluded that the plaintiff "was not under a disability, as defined in the Social Security Act, at any time from September 17, 2012, the alleged onset date, through September 3, 2015, the day before the claimant's established disability onset date." <u>Id.</u> at 23 (citing 20 C.F.R. §404.1520(g)). The plaintiff did not file written exceptions disagreeing with the ALJ's decision and the Appeals Council did not assume jurisdiction of the case, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. §404.984.

On January 16, 2019, the plaintiff appealed, seeking this court's review of the final administrative decision. Dkt. No. 1. The plaintiff is represented on appeal by Attorney Meredith Marcus. The plaintiff asks the court to reverse the ALJ's denial of benefits and remand the case under sentence four of 42 U.S.C. §405(g) to the ALJ for reconsideration. Dkt. No. 21 at 19. After several

---

[1] The claimant bears the burden of proof at steps one through four; at step five, the burden shifts to the Commissioner. <u>Ghiselli v. Colvin</u>, 837 F.3d 771, 776 (7th Cir. 2016) (citing <u>Butera v. Apfel</u>, 173 F.3d 1049, 1054 (7th Cir. 1999)).

5

extensions requested by both parties and an amended briefing schedule, dkt. nos. 11, 13, 17, 22, 25, 29, the appeal before this court was fully briefed. Dkt. Nos. 21 (plaintiff's brief), 28 (Commissioner's brief), 31 (plaintiff's reply brief). The court scheduled a hearing for June 17, 2021. Dkt. No. 32. On May 4, 2021, the Commissioner filed a notice of supplemental authority drawing the court's attention to <u>Pavlicek v. Saul</u>, 994 F.3d 777 (7th Cir. 2021). Dkt. No. 33. The Commissioner indicated that this "decision was rendered after the completion of the briefing in this case and . . . is a pertinent and significant authority relevant to an issue raised in this case." <u>Id.</u> The plaintiff filed a motion seeking leave to file a response. Dkt. No. 34. The plaintiff contended that she sought to clarify only that the supplemental authority did not change "the law as to how cases dealing with moderate limitations of concentration, persistence or pace are adjudicated." <u>Id.</u> at 1. <u>See</u> Dkt. No. 34-1 (plaintiff's full response).

Due to a conflict on the court's calendar, the court re-scheduled the hearing for July 7, 2021. Dkt. No. 35. At the hearing, the court first addressed the plaintiff's motion for leave to file a response to the Commissioner's notice of supplemental authority. Dkt. No. 36 at 1:05–3:53 (hearing audio). The court denied the motion: "The court explained that the local rules allow parties to notify the court of supplemental authority but do not allow for argument. Finding that the plaintiff's motion sought to provide additional argument, the court denied it." Dkt. No. 37 (court minutes). The court next allowed the parties to present oral argument. Dkt. No. 36 at 4:00–11:03.

6

The court then addressed the plaintiff's first argument that the ALJ should have recused himself from the case because of a June 2016 interaction between the plaintiff and the ALJ that resulted in the ALJ being prejudiced or biased during the 2018 hearing. Dkt. No. 36 at 13:17–23:57. The court concluded that there was no evidence demonstrating that the ALJ was prejudiced or partial in any respect such that he should have recused himself. Id. at 18:35–18:47. The court found that the fact that the ALJ saw the plaintiff at her place of business did not give the ALJ any particular or specialized knowledge about her that he would not already have had as part of his work on the plaintiff's file, in part because the ALJ had known at both the first and second hearings that the plaintiff had part-time work. Id. at 18:48–19:54. The court also observed that the briefing was not detailed in its description of the June 2016 encounter, but that the interaction sounded minimal; the court was not convinced that this chance encounter created an appearance of impropriety. Id. at 19:55–20:58. Regarding bias, the court stated that the mere fact that an ALJ has personal experience with a particular disability or disabling condition does not make him biased. Id. at 21:00–21:01. Citing Dean v. Colvin, the court noted that judges are not required to have an "empty mind," just an "open mind" and a willingness to consider all the facts. Id. (quoting Dean v. Colvin, 585 F. App'x 904, 905 (7th Cir. 2014)). The court found that the ALJ was not biased simply because he had personal experience with an individual who had multiple sclerosis and who was able to work, and the court pointed out that the ALJ had issued a decision awarding benefits to

7

the plaintiff for a period based primarily on the fact that she has multiple sclerosis. Id. In sum, the court informed the parties that although it was not rendering a final decision on all the issues raised by the plaintiff, it did find that the plaintiff's first argument—that the ALJ failed to recuse himself—did not warrant remand. Id. at 23:15–23:28. The court stated that it was affirming on that issue because there was no evidence of impropriety, prejudice, bias or a closed mind, and that the interaction seemed fairly innocuous and not one that should have disqualified the ALJ. Id. at 23:29–23:59. See also Dkt. No. 37 (court minutes stating that the court "rejected the plaintiff's argument that the ALJ should have recused himself").

At the end of the hearing, the court explained that it was not in a position to provide an oral ruling on the remaining arguments, but that it would issue either a written or future oral decision. Dkt. No. 36 at 24:00–24:24.

## II.    Standard of Review

Section 405(g) of Title 42 limits the court's review; the district court must uphold the decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. §405(g); Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009) (citation omitted). Courts have defined substantial evidence as "such relevant evidence as a reasonable

mind could accept as adequate to support a conclusion." Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010). A decision denying benefits need not discuss every piece of evidence; remand is appropriate, however, when an ALJ fails to provide adequate support for the conclusions drawn. Jelinek, 662 F.3d at 811. If conflicting evidence in the record would allow reasonable minds to disagree about whether the plaintiff is disabled, the ALJ's decision to deny the application for benefits must be affirmed if the decision is adequately supported. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).

The district court must review the entire record, including both evidence that supports the ALJ's conclusions and evidence that detracts from the ALJ's conclusions, but it may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." Id. "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." Biestek v. Berryhill, ___ U.S. ___, 139 S. Ct. 1148, 1154 (2019). Judicial review is limited to the rationales offered by the ALJ. Shauger v. Astrue, 675 F.3d 690, 697 (7th Cir. 2012) (citing SEC v. Chenery Corp., 318 U.S. 80, 93–95 (1943)). The ALJ must follow the Social Security Administration's rulings and regulations in making a determination. Failure to do so requires reversal unless the error is harmless. See Prochaska v. Barnhart, 454 F.3d 731, 736–37 (7th Cir. 2006). A reviewing court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." Burmester v. Berryhill,

920 F.3d 507, 510 (7th Cir. 2019) (quoting Lopez *ex rel.* Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003)). The district court will uphold a decision so long as the record reasonably supports it and the ALJ explains her analysis of the evidence with enough detail and clarity to permit meaningful review. Eichstadt v. Astrue, 534 F.3d 663, 665–66 (7th Cir. 2008).

## III.  Analysis

The plaintiff's arguments can be grouped into four reasons the court must remand: (1) the ALJ should have recused himself; (2) the ALJ's step three determination was flawed because the ALJ erred in his analysis of the paragraph B criteria; (3) the ALJ erred in evaluating the opinion evidence and the plaintiff's residual functional capacity (RFC); and (4) the ALJ's subjective symptom analysis was flawed. Dkt. No. 21 at 9, 10, 12, 16.

### A.  Whether the ALJ Should Have Recused Himself

The plaintiff argued on appeal that the ALJ should have recused himself from this case after running into the plaintiff at her part-time job in June of 2016 and interacting with her without an attorney present. Dkt. No. 21 at 9 (citing HALLEX I-2-1-60). Transmittal I-2-1-60 of the Hearings, Appeals, and Litigation Law Manual (HALLEX) provides the following:

> Under 20 CFR 404.940 and 416.1440, an administrative law judge (ALJ) must disqualify or recuse himself or herself from adjudicating a case if the ALJ is prejudiced or partial with respect to any party or has any interest in the matter pending for decision.

> However, disqualification is not a matter of personal preference or reluctance to handle a particular case. An ALJ must have reasonable and proper grounds for disqualifying himself or herself. For example, an ALJ may withdraw from the case if:

10

> • The ALJ shares an acquaintance with, but does not know, the claimant or any other party;
>
> • The ALJ has particular knowledge about the claimant or any other party from an extrajudicial source; or
>
> • The ALJ believes his or her participation in the case would give an appearance of impropriety.

HALLEX I-2-1-60(A).[2]

The plaintiff had argued that the ALJ had particular knowledge about the plaintiff, gave an appearance of impropriety through his participation and was biased against the plaintiff's multiple sclerosis. Dkt. No. 21 at 9-10. The argument was based on a chance encounter during which the ALJ saw and spoke with the plaintiff at the plaintiff's place of employment. The plaintiff asserted both that the ALJ gained "particular knowledge" about the plaintiff during the encounter and that he was biased about multiple sclerosis patients because "he was at her place of business and interacted with her there [and] he knew of Elmer having encountered her at her place of business and ongoing interaction." Id. Citing her own writings, the plaintiff argued that she and the ALJ discussed "substantial gainful activity" and that the ALJ told her he previously dated a woman with multiple sclerosis and that woman had been able to work. Id. at 10. These notes are dated May 21, 2018. Id. (citing Dkt. No. 16-25 at 27–28). The plaintiff argued that the ALJ's continued participation in the case after their encounter "provides at least the appearance of impropriety where he used her part-time work as rationale to find her subjective symptoms

---

[2] Available at https://www.ssa.gov/OP_Home/hallex/I-02/I-2-1-60.html.

not entirely supported." Dkt. No. 21 at 10. She cited the Supreme Court's decision in Liteky v. United States, 510 U.S. 540, 555 (1994) to imply that the ALJ demonstrated bias through his comments during their conversation. Id.

The defendant opposed remand on this claim. He pointed out the timing of this encounter. The defendant argued that the ALJ had no need to recuse himself because the interaction occurred in June 2016, "after [the ALJ] issued the prior partially favorable decision." Dkt. No. 28 at 4. The defendant then pointed to 20 C.F.R. §404.940, which prohibits an ALJ from conducting a hearing "if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." Id. The Commissioner cited HALLEX I-2-1-60 to further support this position. Id. The defendant argued that the law prompts the ALJ to consider recusal when he has particular knowledge of a claimant and some appearance of impropriety but does not require such recusal. Id. Additionally, the ALJ in this case considered recusal and explained why he chose not to recuse himself over argument by the plaintiff. Id. (citing Dkt. No. 16-21 at 6–7; 39–48). Citing the Seventh Circuit's decision in Keith v. Barnhart, 473 F.3d 782, 788 (7th Cir. 2007), the defendant argued that the plaintiff failed to show the ALJ was biased to a level requiring the court to overturn his decision. Id. at 5.

As the court held at the hearing, the fact that the ALJ saw the plaintiff at her place of business does not mean he had particular knowledge of her ability to work or any other information relevant to her Social Security application. The ALJ saw her working during the period for which she had already been

12

granted disability. The ALJ would have been able to obtain this information from the record or hearing, because the plaintiff's past and present work experience was part of her application and testimony. The plaintiff offered no meaningful rationale for why the court should overturn the ALJ's decision based on his knowledge of information already readily available in proceedings.

With respect to a perception of impropriety, it is unclear how this interaction would have meaningfully affected the ALJ's impartiality. The mere fact that the ALJ considered the plaintiff's part time work is insignificant, as he would have had access to that information regardless of the chance encounter.

As to potential bias, the Seventh Circuit has made clear that there is no expectation the ALJ come into a case with an "empty mind." Dean v. Colvin, 585 F. App'x 904, 905 (7th Cir. 2014) (citing Liteky v. United States, 510 U.S. 540 (1994)). Merely an "'open mind' is required. . . . [K]nowing facts about a litigant differs from prejudice." Id. All judges come into cases with a fund of knowledge which they may apply based on the facts presented. Id. at 904. The plaintiff's argument assumes that the ALJ was biased because of his previous exposure to an ex-girlfriend with multiple sclerosis, but her argument is undermined by the ALJ's previous decision awarding benefits as of September 4, 2015, primarily because of her multiple sclerosis. See Dkt. No. 16-21 at 7. The mere fact that the ALJ had prior ideas about the disease is insufficient to show that he was prejudiced against the plaintiff.

13

As it said it would do at the hearing, the court will reject the plaintiff's argument that the ALJ should have recused himself and will not remand on this issue.

B. The ALJ's Step Three Determination and Consideration of the Paragraph B Criteria

The plaintiff next argues that the ALJ's step three analysis was inadequate because the ALJ failed to evaluate evidence supporting the plaintiff's claim and engaged in impermissible cherry-picking. Dkt. No. 21 at 10. The plaintiff asserts that the ALJ erred in analyzing the paragraph B criteria under Listing 12.04 and incorrectly found that the plaintiff had only moderate limitations in concentration, persistence and pace and in interacting with others. Id. at 10–12.

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004) (citations omitted). The ALJ "has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010). Nevertheless, "an ALJ need not mention every piece of evidence, so long as he builds a logical bridge from the evidence to his conclusion." Id.

Listing 12.04 covers depressive, bipolar and related disorders, and like listings for other mental disorders, includes "three paragraphs, designated A,

14

B, and C." 20 C.F.R. Part 404, Subpt. P, App. 1 §12.00(A)(2). For a claimant's mental impairment to meet or medically equal the severity of Listing 12.04, it "must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C." Id. Paragraph A includes the medical criteria that must be present in the claimant's medical evidence. Id. at §12.00(A)(2)(a). Paragraph B provides the functional criteria ALJs assess to evaluate how a claimant's mental disorder limits her functioning. Id. at §12.00(A)(2)(b). These paragraph B "criteria represent the areas of mental functioning a person uses in a work setting": understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. Id. "To satisfy the paragraph B criteria, [a claimant's] mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." Id. See also id. at §12.04(B). A claimant's mental disorder results in a "marked" limitation when her "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." Id. at §12.00(F)(2)(d). A claimant has an "extreme" limitation when she is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." Id. at §12.00(F)(2)(e).

The plaintiff focuses on assertions that the ALJ erred in analyzing the paragraph B criteria. First, the plaintiff argues that the ALJ's discussion of her limitations in concentration, persistence and pace omitted relevant information from the record. Dkt. No. 21 at 10–11. She argues the ALJ improperly relied on

15

and drew conclusions from her part-time work. Id. at 10 (citing Lanigan v. Berryhill, 865 F.3d 558, 565 (7th Cir. 2017)). The plaintiff then argues that her concentration, attention and memory were fluctuating or declining as of early 2013 and that a March 2013 report indicates she had a Global Assessment of Functioning (GAF) score of 45. Id. at 11 (citing Dkt. No. 16-14 at 4–5). During that time, she was voluntarily admitted to the hospital with symptoms of depression and severe anxiety. Id. The plaintiff contends that she was experiencing panic attacks and shakiness and had difficulty concentrating, restlessness and muscle tension. Id. (citing Dkt. No. 16-14 at 20). She directs the court to three reports by Nurse Joachim which noted *marked* limitations in concentration and attention. Id. (citing Dkt. Nos. 16-20 at 64; 16-26 at 8–13, 31–37).

The plaintiff argues that the ALJ omitted from the record information pertaining to her ability to interact with others. Dkt. No. 21 at 11–12. The plaintiff asserts that she was reprimanded at work and treated poorly by her supervising sergeant, and that she was not functioning well under stress. Id. at 11 (citing Dkt. No. 16-15 at 37). The plaintiff emphasizes how her relationships with friends, family and her therapist were declining. Id. (citing Dkt. Nos. 16-12 at 11; 16-13 at 46). In January 2013, a physician described the plaintiff as agitated and nervous, id. at 11-12 (citing Dkt. No. 16-27 at 13), and by May of that year, she was afraid to leave her house, id. at 12 (Dkt. No. 16-14 at 26). The plaintiff says she experienced crying spells and social anxiety. Id. (citing dkt. no. 16-14 at 26–27). The plaintiff again points to Nurse Joachim's report,

16

which referenced the plaintiff's issues in social functioning. Id. (citing Dkt. Nos. 16-20 at 63–64, 16-26 at 8–13, 31–37). The plaintiff disputes the importance of her pursuit of part-time work, arguing that her lack of any attempt to engage in part-time work for over a year after her onset date should meet the criteria of Listing 12.04. Id. (citing Dkt. No. 16-27 at 46; 42 U.S.C. §423(d)(1)(A)). She further argues that her socialization with friends was limited, and that the same was true of the frequency with which she dined out. Id.

The ALJ found that the plaintiff had a moderate limitation in both concentration, persistence and pace and in interacting with others. Dkt. No. 16-21 at 11. Regarding concentration, persistence and pace, the ALJ found that the plaintiff "exhibited intact attention and concentration as well as logical and goal-directed thoughts across examinations and reported improvement in her attention and concentration with medication." Id. (citing Dkt. Nos. 16-14 at 20, 29; 16-16 at 11; 16–17 at 56, 62; 16-18 at 15, 17–18, 20–22; 16-20 at 62). The ALJ recognized the plaintiff's subjective complaints regarding her abilities to sustain focus and attention as well as her ability to complete tasks, but found that they lacked evidence in the record beyond a moderate limitation. Id. The ALJ also discussed the plaintiff's success maintaining her part-time position at the car dealership during 2012 and 2013 while reportedly experiencing panic attacks twice per week. Id. He noted that the plaintiff's panic attacks decreased with treatment. Id.

In analyzing the plaintiff's ability to interact with others, the ALJ acknowledged her reports of social isolation and withdrawal, as well as her

difficulty handling direction or negative feedback. Dkt. No. 16-21 at 11. He discussed the objective evidence in the record. Citing several reports, the ALJ observed that the plaintiff's treating providers "regularly described the claimant as positive and cooperative," which confirmed the plaintiff's ability to have positive and appropriate interactions with others. Id. (citing Dkt. Nos. 16-15; 16-16; 16-17; 16-18 at 1–22). The ALJ also noted the plaintiff's ability to engage in activities outside of her home, such as spending time with friends, shopping in stores and going out to eat, as well as the plaintiff's decision to pursue employment at the car dealership, a position that required frequent socializing. Id.

The ALJ did omit some of the information cited by the plaintiff. He did not discuss the 2013 progress notes from the American Behavioral Clinics that said the plaintiff's concentration and attention were "fluctuating." Dkt. No. 16-14 at 4. The value of this information is unclear. The scale used on that document does not indicate the severity of a "fluctuates" designation. See id. The April 2013 report shows that the plaintiff reported having two panic attacks since her last appointment, id. at 20, which was no earlier than March 2013, see id. at 9. But the document does not indicate when these panic attacks occurred, how long they lasted, what caused them or anything else that might explain how they might impede her concentration, persistence or pace. Id. at 20. On that same document, the professional filling out the form indicated that the plaintiff self-reported difficulty concentrating. The individual noted, however, that the plaintiff's attention and concentration were "good" and

that the plaintiff "denies" having unrealistic, excessive, hypervigilant, apprehensive or uncontrollable worries. Id. The note on the document about the plaintiff's shakes and muscle tension is not associated with any additional information on the page. Id. The report in which the plaintiff reported "hold[ing] it together during most of the day, it's when I get home that starts the anxiety and racing thoughts" does not indicate a problem with focusing and doing work during the day. See Dkt. No. 16-18 at 16. That report also noted that the plaintiff's attention and concentration were "intact." Id. None of these omissions undermine the ALJ's determination of a moderate limitation in concentration, persistence and pace. They do not undermine the logical bridge laid out in the ALJ's decision.

Although the plaintiff emphasizes that she "was assigned a GAF score of 45," dkt. no. 21 at 11, the ALJ's decision did not entirely omit the March 2013 GAF score. In evaluating the medical evidence later in the decision, the ALJ noted that the plaintiff's care providers assigned GAF scores generally ranging from 30 to 75. Dkt. No. 16-21 at 21 (citing Dkt. Nos. 16-11 at 26–51; 16-13 at 54–65; 16-14 at 2–8; 16-15; 16-16; 16-18 at 23–30; 16-20 at 62–64; 16-26 at 8–13, 42–44). The ALJ gave these scores "little weight" for several reasons:

> GAF scores represent a snapshot in time. They reflect the claimant's functioning on the day of examination rather than over the course of time. . . . These scores, therefore, are not a good indicator of the claimant's overall functioning during the period in question. In addition, GAF ratings lack standardization, meaning it is difficult to draw reliable inferences from differences in GAF ratings assigned by different clinicians.

19

Dkt. No. 16-21 at 21–22.[3] And although the plaintiff points to records discussing her memory impairments, dkt. no. 21 at 11, this evidence is not relevant to the ALJ's discussion of concentration, persistence and pace or interaction with others. Issues with the plaintiff's memory fall under a separate area of the paragraph B criteria: understanding, remembering or applying information. The plaintiff has not challenged the ALJ's decision regarding that aspect of mental functioning.

Nor do the plaintiff's voluntary admission to the hospital in March 2013 and the reports by Nurse Joachim undermine the ALJ's decision. Around the period in which the plaintiff admitted herself into the hospital for symptoms of depression and anxiety, the plaintiff also was observed to have good attention and concentration. The plaintiff voluntarily admitted herself on March 5, 2013. Dkt. No. 16-13 at 54. The ALJ's decision noted two occasions in the four months after that time on which the plaintiff exhibited good and intact concentration and attention. Dkt. No. 16-21 at 11 (citing Dkt. No. 16-14 at 20, 29). The hospital records themselves do not include any information on the plaintiff's concentration, persistence or pace. See Dkt. No. 16-13 at 54–65.

The August 2015 report by Nurse Joachim noted marked limitations in "[t]he ability to understand and remember detailed instructions," "[t]he ability to carry out detailed instructions," "[t]he ability to maintain attention and

---

[3] "'[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score.'" Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010) (quoting Wilkins v. Barnhart, 69 F. App'x 775, 780 (7th Cir. 2003)).

concentration for extended periods," "[t]he ability to sustain an ordinary routine without special supervision," "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms," and "[t]he ability to respond appropriately to changes in the work setting." Dkt. No. 16-20 at 64. This report was completed on August 6, 2015, less than one month before the date on which the plaintiff already has been found to be disabled. The other reports the plaintiff cites—Mental Residual Functional Capacity Questionnaires completed by Joachim on August 10, 2017 and March 26, 2018—were completed after the end of the relevant period for the plaintiff's current application, but they indicated that plaintiff had been suffering from similar limitations since February 28, 2013. See Dkt. No. 16-26 at 13, 37. Yet the ALJ pointed out that on at least six occasions since February 28, 2013, Joachim had recorded that the plaintiff's attention/concentration was "intact," "improved" or that the plaintiff denied having poor focus and concentration. See Dkt. No. 16-21 at 11 (citing Dkt. No. 16-18 at 15, 17–18, 20–22). These reports are dated June and October 2013; January, May and November 2014; and March 2015. Dkt. No. 16-18 at 15, 17–18, 20–22. Joachim's reports, therefore, are inconsistent with each other. The ALJ's decision includes a lengthy discussion of Joachim's reports. See dkt. no. 16-21 at 18–20. He gives her opinions little weight, primarily based on the speculative and inconsistent nature of her statements. See id. The ALJ's determination of a "moderate limitation" in concentration, persistence and pace reflects the middle

ground in which he believed the plaintiff's limitations fell. The plaintiff has not demonstrated the lack of a logical bridge in that determination.

With respect to the plaintiff's ability to interact with others, the plaintiff again has not demonstrated the lack of a logical bridge in the ALJ's decision. She begins by describing her inability to function under stress, but the date of the report she cites is from before the onset date. See Dkt. No. 16-15 at 37. Further, the ALJ discussed the plaintiff's "difficulty accepting instructions and criticism." Dkt. No. 21 at 11. The plaintiff's statements that she "has no friends" and that her family "doesn't want anything to do with" her again cites a report from before her onset date. Dkt. No. 21 at 11 (citing Dkt. No. 16-12 at 11). The ALJ also discussed the plaintiff's relationship with friends, acknowledging her reports of social isolation and withdrawal but noting she spent "at least some time with friends." Dkt. No. 16-21 at 11. The plaintiff provides no source for her assertions about her relationship with her family, or for her statement about her therapist "dump[ing]" her. See Dkt. No. 21 at 11.

The facts that the plaintiff gets stressed at work, is agitated and nervous, did not like her therapist and infrequently goes out to eat do not undermine the ALJ's decision. The records the plaintiff has cited do not indicate that her difficulties in these situations stems from social problems. While the plaintiff alleges that report reflect "antisocial" behavior, id. at 12, the reports also describe her "cooperative" attitude, see dkt. no. 16-14 at 26. The ALJ discussed this cooperative attitude in similar situations in his decision. Dkt. No. 16-21 at 11. The fact that the plaintiff did not attempt to work for a year does not equate

22

to an inability to engage in substantial gainful activity, because she successfully began and maintained part-time work after this one-year period. The assertion that she does not get along well with authority figures does not support a conclusion that she has a complete inability to interact with others. Finally, regarding concentration, persistence and pace, Joachim wrote that the plaintiff was unable to get along with coworkers without distracting them and was equally unable to accept instructions and respond to criticism from superiors. Dkt. No. 16-26 at 9. The ALJ discussed these problems and determined that "the record permits only a moderate restriction in this area." Dkt. No. 16-21 at 11. To re-examine the data points provided by Joachim's report would be to re-weigh the evidence, which is not this appellate court's role in Social Security cases. The court also will not reconsider the weight the ALJ gave to Joachim's opinions themselves, because the plaintiff has not challenged the ALJ's decision on that front.

Because none of the above break the logical bridge in the ALJ's decision, and the court is unable to reweigh the evidence in the record, the court will affirm on this issue.

C.   The ALJ's Evaluation of the Opinion Evidence and the Plaintiff's RFC

The plaintiff next challenges the ALJ's RFC determination, although her argument is not clear. She titled this section of her brief "The ALJ Erred in Evaluating the Opinion Evidence and [the Plaintiff's] RFC." Dkt. No. 21 at 12. The arguments in the body of this section address the ALJ's alleged failure to

23

"consider all the relevant evidence in the record, including testimony by the claimant, as well as evidence regarding limitations that are not severe." Id. The section also includes an argument about SSR 96-8 and an attack on the number of hours and days per week the plaintiff can work and how much she can lift and carry. Id. at 12–14. She also makes arguments about the opinions of treating physicians and state agency physicians. See id. 12–15. The plaintiff addresses her gait, accuses the ALJ of substituting his own knowledge for those of her physicians by "playing doctor," comments on the weight given to the opinions of Joachim and challenges the ALJ's reliance on her part-time work. See id. at 14–15. The court interprets this section to be a challenge to the ALJ's RFC determination with respect to SSR 96-8.

In the RFC, the ALJ determined that the plaintiff could perform light work with the following additional limitations:

> She could not operate foot controls with the left lower extremity. She could occasionally climb ramps or stairs. She could never climb ladders, ropes or scaffolds. She could never work at unprotected heights nor around moving mechanical parts. She could occasionally operate a motor vehicle in the work place. She could never work in an environment that would result in exposure to extreme heat. She could never work in an environment that would result in exposure to vibration beyond what one experiences in everyday life. With regard to understanding, remembering and carrying out instructions, the claimant could perform simple, routine and repetitive tasks, but not at a production rate pace (for example, not assembly line work). With regard to the use of judgment in the workplace, she could make simple work-related decisions. She would have been capable of frequent appropriate interactions with supervisors and occasional appropriate interactions with co-workers and the general public. The claimant would have been capable of tolerating occasional changes in a routine work setting.

24

Dkt. No. 16-21 at 12. The requirements for "light work" are set out in 20 C.F.R. §404.1567(b):

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

SSR 83-10 further clarifies the requirements of this definition, adding that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6.

Prior to determining whether the plaintiff can engage in light work, "[t]he RFC assessment must first identify the individual's function limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 98-6p, 1996 WL 374184, at *1. The purpose of the function-by-function assessment is to ensure "that the ALJ does not overlook an important restriction and thereby incorrectly classify the individual's capacity for work." Zatz v. Astrue, 346 F. App'x 107, 111 (7th Cir. 2009). The ALJ is not required to perform a "superfluous analysis of irrelevant limitations or relevant limitations" in the absence of conflicting medical evidence. Id.

25

SSR 96-8p states:

> Exertional capacity addresses an individual's limitations and restrictions of physical strength and denies the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately . . . even if the final RFC assessment will combine activities.

SSR 96-8P, 1996 WL 374184, at *5.

The Seventh Circuit has explained that "although the RFC assessment is a function-by-function assessment," "the expression of a claimant's RFC need not be articulated function-by-function." Knox v. Astrue, 327 F. App'x 652, 657 (7th 2009). "A narrative discussion of a claimant's symptoms and medical source opinions is sufficient." Id. See also Jeske v. Berryhill, No. 18-C-371, 2019 WL1326906, *8 (E.D. Wis. Mar. 25, 2019).

In Jeske v. Saul, the Seventh Circuit articulated the precedent in this circuit on the function-by-function requirement:

> Jeske is right that the ALJ did not organize his discussion to include a section addressing each of the seven strength functions, one by one. We join our sister courts, however, in concluding that a decision lacking a seven-part function-by-function written account of the claimant's exertional capacity does not necessarily require remand. *See, e.g., Mascio v. Colvin*, 780 F.3d 632, 635–36 (4th Cir. 2015); *Hendron v. Colvin*, 767 F.3d 951, 956–57 (10th Cir. 2014); *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (*per curiam*); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *Depover v. Barnhart*, 349 F.3d 563, 567–68 (8th Cir. 2003).

> Our role is to determine whether the ALJ applied the right standards and produced a decision supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Clifford*, 227 F.3d at 869. The ALJ's explanation must enable us to meaningfully carry out that role. *Cf. Mascio,* 780 F.3d at 636–37. But if we can tell that the ALJ considered the claimant's ability to perform all seven functions, we need not remand to have the ALJ better articulate its analysis on the

26

claimant's exertional capacity. Of course, if the ALJ does not articulate findings on a function, the risk is greater that we will conclude the ALJ failed to consider it. Yet, the lack of an explicit finding does not necessarily prevent us from concluding that the ALJ appropriately considered a function.

Jeske v. Saul, 955 F.3d 583, 596 (7th Cir. 2020).

The ALJ discussed a December 2012 function report filled out by the plaintiff in which the plaintiff wrote that she could sit for six hours and stand for another six, requiring breaks for both. Dkt. No. 16-21 at 13 (citing Dkt. No. 16-8 at 31). The plaintiff also stated she could walk one hour a day, again with breaks. Id. The ALJ wrote that the plaintiff was able to walk without issues, other than a mildly ataxic gate. Id. at 16–17. As to the plaintiff's ability to push, the ALJ acknowledged her statements that "she could not do household repairs or more physically demanding chores like mowing and snow shoveling." Id. at 13. Both chores require mostly pushing. Yet, the ALJ repeatedly noted the numerous reports in the record in which the plaintiff's physicians found normal levels of strength. See id. at 16–17 (citing Dkt. Nos. 16-13 at 52; 16-16 at 11–12; 16-20 at 22, 39, 56; 16-28 at 52, 59; 16-29 at 7). These appointments cover June 2012 to June 2015, nearly the full relevant period. Id. The medical evidence in these reports is inconsistent with the plaintiff's subjective statements that she is unable to push.

This is not a case in which the ALJ substituted his own knowledge for that of a physician or "played doctor." The ALJ used information from the record to support his determination that the plaintiff had normal strength and could walk, sit and stand. The plaintiff's own statements indicate that she can

27

stand and sit for at least six hours daily, and any issues with fatigue are addressed by the RFC's limitations on the rate of production and the "simple, routine and repetitive tasks." "An ALJ has 'final responsibility' for determining a claimant's residual functional capacity and need not adopt any one doctor's opinion." Fanta v. Saul, 848 F. App'x 655, 658 (7th Cir. 2021) (citing 20 C.F.R. §404.1527(d)(2); Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007)). "[A]n ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." Schmidt, 496 F.3d at 845 (citing Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1995)). And an ALJ does not impermissibly "play doctor" or substitute his judgment by considering the medical evidence in the record and declining to adopt more severe restrictions. The Seventh Circuit has considered the assertion that an "ALJ 'played doctor' by basing the [RFC] assessment on her own interpretation of medical evidence rather than on the doctors' assessments" and found this argument "meritless." Fanta, 848 F. App'x at 658.

The plaintiff takes issue with the ALJ's use of the term "stable" when discussing her multiple sclerosis. See Dkt. No. 21 at 14. Although the plaintiff offers opinions by courts that have taken issue with this term in its relation to a claimant's capabilities, the plaintiff consistently had good strength and adequate mobility. The term "stable" appears to refer to the plaintiff's consistently positive test results in these and other areas. See Dkt. No. 16-21 at 16.

28

The rest of the plaintiff's arguments do not apply to SSR 96-8p. With respect to the ALJ's consideration of the plaintiff's part-time work, the ALJ did not equate the plaintiff's ability to complete part time work to an ability to perform full-time employment. Rather, he stated that "her part-time semi-skilled and skilled employment demonstrate the claimant's capacity for performing very short and simple instructions." Id. at 18.

The ALJ also addressed the plaintiff's panic attacks. He discussed reports in which the plaintiff had noted improvement in her mood and a reduction in panic attacks. Id. at 15 (citing Dkt. Nos. 16-14 at 29; 16-17 at 60; 16-18 at 15, 18, 20–22; 16-20 at 62-64; 16-27 at 29; 16-28 at 51; 16-29 at 42).

Again, this appellate court cannot reweigh the evidence. The ALJ had substantial evidence for his decision on the RFC and did not err under the requirements of SSR 96-8p. The court will affirm on this issue.

D.     The ALJ's Subjective Symptom Analysis

Finally, the plaintiff challenges the ALJ's analysis of the subjective symptom evidence. Specifically, the plaintiff attacks the ALJ's determination about the intensity, persistence and the limiting effects of her symptoms. Dkt. No. 21 at 16. She argues that the subjective symptoms do not support a determination that she was capable of light work. Id. at 18. The plaintiff's argument focuses primarily on her issues with panic attacks and fatigue. Id. at 17.

Under Social Security Ruling 16-3p, ALJs are required to make two determinations in evaluating symptoms in a disability claim. First, the ALJ

29

must determine "whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." SSR 16-3p, 2017 WL 5180304, at *3. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." Id. The ALJ is obligated to carefully examine both medical and non-medical evidence in deciding. 20 C.F.R. §404.1529(c)(3); SSR 16-3p, at *4–5. This includes an evaluation of the plaintiff's subjective symptoms. When given evidence in the form of the plaintiff's testimony on subjective symptoms, the ALJ must "justify the credibility finding with specific reasons supported by the record." Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009). The ALJ is required to "articulate specific reasons for discounting a claimant's testimony as being less than credible" and must refrain "from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." Schmidt v. Barnhart, 395 F.3d 737, 746–47 (7th Cir. 2005).

The plaintiff's brief sheds little light on which subjective symptoms she claims were not properly evaluated. She lists her testimony that she was having panic attacks at least twice per week, inside and outside of work. Dkt. No. 21 at 17 (citing Dkt. No. 16-21 at 61–63). She testified that when she had a panic attack at work, she took a bathroom break. Id. She disagrees with the ALJ's conclusion that her panic attacks were under control and cites a page

from the record reflecting problems with panic attacks in June 2014. Id. (citing Dkt. No. 16-28 at 51). In December 2013, the plaintiff told a doctor that she was okay but "still gets 'flashback' type experiences that 'set (her) off' and increase her panic and nervousness." Id. (quoting Dkt. No. 16-27 at 45). In May 2015, the plaintiff reported that she could "hold it together during most of the day, its [sic] when I get home that starts the anxiety and racing thoughts." Id. (citing dkt. no. 16-18 at 16). She testified in her 2015 hearing that her MS—more specifically, her fatigue from MS—was her biggest obstacle to working full-time. Id. at 18 (citing Dkt. No. 16-4 at 4–5). At the 2018 hearing, the plaintiff testified that she worked from a seated position in her part-time job. Id. (citing Dkt. No. 16-21 at 62). She argues that this is consistent with her previous subjective statements that her foot would drag as she walked, and that she would become fatigued. Id. (citing Dkt. No. 16-8 at 28). The plaintiff also argues that her part-time work does not represent an ability to do full-time work with respect to her fatigue. Dkt. No. 21 at 18. She says she would need to sleep during her lunch break and have a flexible job with sitting, standing and breaks. Id.

The plaintiff points to several portions of the record as evidentiary support for her subjective symptoms. She suggests that these documents show the ALJ ignored contrary evidence when considering her limitations. Dkt. No. 21 at 17 (citing Arnett v. Astrue, 676 F.3d 586, 592 (7th Cir. 2012)). In June 2012, a psychologist wrote in her report on the plaintiff that she was concerned "regarding [the plaintiff's] emotional health, stress, anxiety and depression." Id.

31

(citing Dkt. No. 16-16 at 2). This page of the record specifically connects the plaintiff's stress to her work and indicates that her stress resulted in mistakes while working. Id. The plaintiff also points to her hospital records from when she was admitted in March 2013 for symptoms of depression and anxiety. Dkt. No. 21 at 17 (citing Dkt. Nos. 16-13 at 54–55, 16-26 at 42–43). While this report does not state anything specific on the plaintiff's panic attacks during this period, it could imply disruptive levels of anxiety.

The ALJ determined that the plaintiff's impairments reasonably could be expected to cause her alleged symptoms but found that her statements on the intensity, persistence and limiting effects of those symptoms were not consistent with the medical and other evidence. Dkt. No. 16-21 at 15. He concluded that the plaintiff was capable of light work. Id. at 12.

The ALJ began his evaluation by discussing the plaintiff's self-reported physical limitations. Referencing a 2012 function report completed by the plaintiff, the ALJ noted the plaintiff's statement that she could sit and stand for only three hours each at a time, six hours each with breaks throughout the day, and only walk for fifteen to twenty minutes at a time without breaks. Id. at 13 (citing Dkt. No. 16-8 at 31). The ALJ then discussed the plaintiff's daily activities reflected in the same report, as well as her recent employment as a service concierge at a car dealership from September 2013 through June 2015. Id. The ALJ considered the plaintiff's 2015 hearing testimony that she would rest and nap between her daily tasks. Id. As to her work as a service concierge, the ALJ noted that the plaintiff testified to working four-hour days, five days

32

per week. Id. She said she was unable to work longer hours due to extreme fatigue. Id. The plaintiff then went on to work as a cashier in the service department of a car dealership after her former position was eliminated. Id. at 13–14. This new position required her to work sixteen to twenty hours per week in four-hour shifts. Id. Again, the ALJ summarized the plaintiff's testimony that she was unable to handle full days (eight-hour shifts) "because the service department was very busy and she had trouble with the concentration required for, and pace and stress of, the position." Id. at 14.

The ALJ discussed the plaintiff's subjective symptoms in the medical records. He noted that the plaintiff complained of "persistent and extreme fatigue, weakness, heat intolerance, imbalance, incoordination, cognitive dysfunction, speech problems, falling, tripping and left foot drag, vertigo/dizziness, sensory disturbance, and gastrointestinal and genitourinary abnormalities." Id. The plaintiff was diagnosed with multiple sclerosis and complained that her symptoms were exacerbated by heat exposure. Id. The plaintiff complained of concentration issues with respect to the pace and stress of her part-time work. Id. Based on these symptoms—specifically the plaintiff's complaints of fatigue and weakness as a result of her multiple sclerosis—the ALJ limited the plaintiff to light exertional work. Id. To address the plaintiff's fatigue and stress, the ALJ included a limitation restricting the plaintiff to "simple, routine and repetitive tasks with no production rate pace and only occasional change and simple decisions." Id. at 12, 14.

33

The ALJ then went through a discussion of the plaintiff's subjective mental health symptoms. He noted her reports of depression- and anxiety-based symptoms, "including depressed mood, panic attacks, crying spells, mood swings, irritability, sleep and appetite disruption, difficulty remembering, concentrating and making decisions, inability to handle stressful situations, social isolation/withdrawal, difficulty accepting criticism, low energy and motivation, and feelings of hopelessness and helplessness." Id. at 14. The plaintiff reported that her panic attacks were frequent and intense to a degree requiring medical attention in the emergency room on multiple occasions. Id. The ALJ acknowledged that the plaintiff's panic attacks decreased in frequency upon treatment, but nonetheless continued to occur two or three times per week. Id. While at work, the plaintiff took breaks to manage her panic attack symptoms, but these breaks took longer than her allotted fifteen-minute breaks. Id.

The ALJ addressed the plaintiff's panic attacks, although he did not discuss the relevance of the hospital stay. He mentioned it only tangentially when discussing the plaintiff's GAF scores. See Dkt. No. 16-21 at 21. Instead, he acknowledged the plaintiff's own statement to Dr. Travis Fisher in January 2013 that she was experiencing an overall improvement in her mood and no further panic episodes. Dkt. No. 16-21 at 15 (citing Dkt. Nos. 16-7 at 60; 16-27 at 29). The ALJ then discussed the increase in panic attacks by June 2013, but observed that by that time she had only experienced two in May. Id. (citing Dkt. No. 16-14 at 29). The ALJ discussed the fact that the plaintiff's treating

34

provider noted stable social anxiety during this time. Id. at 16. By January 2014, the treating provider observed that the plaintiff's symptoms had improved and her mood remained stable. Id. Records from this same provider indicate that the plaintiff's anxiety and depression remained in control throughout the rest of 2014 and into early 2015. Id. (citing Dkt. No. 16-19 at 8–10). Under the ALJ's analysis, this stability continued through at least September 2015 and the plaintiff's testimony at her 2015 and 2018 hearings reflected the benefits of medication and treatment. Id. The ALJ found that the plaintiff's physical and mental subjective symptoms were not consistent with the medical evidence and other evidence in the record. Id. at 15.

As to fatigue, the ALJ recognized that the plaintiff's treating neurologist believed the plaintiff's medication had her fatigue under control. Id. (citing Dkt. No. 16-28 at 59). The ALJ asserted that this conclusion "contrasts with [the plaintiff's] July 2015 testimony that her fatigue was overwhelming." Id.

The plaintiff's argument is light on objective evidence from the record and relies heavily on the same subjective symptoms rejected by the ALJ for the reasons he explained, or that he addressed in the RFC. The plaintiff has offered some contrary evidence but nothing that specifically calls into question the ALJ's conclusion. The fact that the ALJ failed to include more discussion of the plaintiff's hospital stay does not call into question his overall conclusion. Nothing in the report from the hospital discusses the plaintiff's panic attacks or anxiety in a manner that reflects upon her capacity to work throughout the day. Otherwise, the plaintiff has failed to provide objective medical evidence

35

other than that in June 2012, prior to her onset date, her anxiety and panic attacks interrupted her capacity to work within the limits of the RFC. The plaintiff has provided nothing objective to support her subjective claims of fatigue. She lists only subjective symptoms either reported to physicians or testified to at hearings. The ALJ addressed these subjective symptoms and supported his credibility findings on them with objective evidence from the record. The court will affirm on this issue.

## IV.    Conclusion

The court **ORDERS** that the final administrative decision of the Commissioner of Social Security, denying the plaintiff's application for disability benefits from September 17, 2012 to September 3, 2015, is **AFFIRMED**.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 30th day of June, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**

36